Mr. Chief Justice Marshall
 

 delivered the opinion of the court, and after stating the facts, proceeded as follows:
 

 At the trial cause seems to have turned princi- - pally on the necessity to unlade the cargo at Mantaiyxas produced by the order- of the Spanish government at the Havanna. As his court concprs with the circuit judge in the opinion that this order was obtained under circumstances which take .from it the character of a force imposed on the master, and compelling him to discharge his cargo, and is, therefore, no excuse for such discharge, it will be unnecessary farther to notice that part of the case. The question to be considered is, that part of the opinion which declares that unlading the cargo at Matanzas, although it oc .asioned no delay and did not increase, but diminish the risk, was a devi-. a tion which discharged the underwriters.
 

 
 *164
 
 The stopping *nd delay at permitted3 "ify the policy.
 

 The unlading 4ho cargo was ?aoi
 

 In considering this question, it is to be observed that the
 
 termini
 
 of the voyage were not changed. The Henry did sail from Teneriffe to the Havanna, and was lost on the voyage from'the .Havanna to Baltimore. The policy permitted her to stop at Matanzás, and the pur- . . .... . .~ pose oí stopping was tp know if there were any men ot war off the Havanna. It would be idle tó stop -for the. purpose of making this enquiry, if it were not intended that the Henry might continue at Matanzas so long as the danger continued. The stopping and delay at Matanzas is then expressly allowed by the policy.
 

 But, admitting this, it is contended, that unlading the cargo is a deviation. „
 

 And why is, it a deviation ? It produced no delay, increase of risk, and did not alter the voyage. The vessel pursued precisely the course marked out for her in the policy. In reason nothing can be found in this transaction which, ought to- discharge the underwriters. If, however, th,e case has been otherwise decided,'especially in this court, those decisions must be respected.
 

 In Stitt v. Wardel, (1
 
 Esp.
 
 N.
 
 P. Rep.
 
 610.) it was determined that liberty to touch and stay at any port, did not give liberty to trade at that port; and. in Sheriff v. Potts, (5
 
 Esp. N. P. Rep.
 
 96.) it was decided that liberty to touch and discharge goods did not authorise the taking in of other gpods.' These . cases certainly bear considerable force on that under consideration, but they were decided at nisiprius, and seem to have been in a great degree overruled by the court in the case of Raine v. Bell, reported in 9th
 
 East.
 
 In that casé, un
 
 *165
 
 tier a policy to touch and stay at any place, goods were taken on board during a necessary stay at Gibraltar. The court was of opinion that as this occasioned no delay nor any increase or alteration of the risk, the plaintiff was entitled to recover. Between the case of Raine v. Bell, and this case, the court can perceive no essential difference.
 

 This east distinguished from the Ms-' ryland Ins. Co, ▼. Le Roy
 
 it ■ al.
 
 7
 
 Crtnch,
 
 26.
 

 In the supreme court of Pennsylvania, (Kingston v. Gerard, 4
 
 Dal.
 
 274.) a similar question occurred, and it was there held, that unlading and selling part oí her cargo by a captured vessel during her detention, would not avoid the policy.
 

 But it is contended, that this point has been settled in this court, in the case of the Maryland Insurance Company against Le Roy and others. In that case, a liberty was reserved in .the policy “to touch at the Cape de Verd Islands for the purchase of stock, such as hogs, goats, and poultry, and faking in water.” The vessel stopped at Fago, one of the Cape de Verd Islands, and took in four bullocks and four Jackasses,, besides water and other provisions, unstowed the dry goods, and broke open, two bales, and took. 40 pieces out of each, for trade. The vessel remained at the island from the 7th to the 24th of May, although the usual delay at those islands for taking in stock and water, when the weather is good, is from two td three days. The wea* ther was good during this delay ; and the bullocks and jackasses encumbered the deck of the vessel, more than small stock would have done. The court left it to the
 
 *166
 
 jury to determine, whether the risk was increased by taking the jackasses on board, and directed them to find for the plaintiffs, unless the risk was thereby increased. The jury found for the plaintiffs ; and this court reversed the judgment rendered ■ on that verdict, because the taking in the jackasses was not within the permission of the policy.
 

 It is perfectly clear, that the case of the Maryland Insurance Company v. Le Roy and others, differs materially from this. In that case, , articles were taken on board which encumbered the deck of the vessel, and which were not within the liberty reserved in the policy. In that case too,'the insured trade:.!, and the delay was considerable and unnecessary ; the risk, if not increased, might be, and certainly was varied. The judge, therefore, ought not to have left it to the jury on the single point of increase of risk.by taking in the jackasses. Although the risk might not be thereby increased, the unauthorised delay and unauthorised trading during that d^lay, connected with taking on board unauthorised articles, discharged the underwriters according to the settled principles of law; and the court does not say in that case that these circumstances were immaterial or without influence. The court does not feel itself constrained by the decision in the Maryland Insurance Company v. Le Roy
 
 et al.
 
 to determine that in. this case also, .which differs from that in several important circumstances, the underwriters are dis
 
 *167
 
 charged. The Judgment is reversed, and the cause remanded, with directions' to issue a
 
 venire facias de novo.
 

 Judgment reversed.'
 

 In the case of Urquhart v. Barnard, it was held by the English court of C. B. that if a ship has liberty, to touch at a port, it is no deviation to take in merchandize during her allowed stay there, if she does by means thereof exceed the period allowed for her remaining there. And that if liberty be given to touch at a port, the contract not defining for what purpose, but a communication having been made to the underwriter, that the-ship was to touch .for fa purpose of trade, it shall be intended as a liberty to touch for that purpose. 1
 
 Taunt.
 
 450. Liberty to touch at a port
 
 for any purpose whatever
 
 includes liberty to touch for the purpose of faking on board part of the goods insured Violet v. Allnutt, 2
 
 Taunt.
 
 416. Under a liberty-to touch and stay at all ports
 
 for all purposes whatsoever’
 
 the stay must be for some purpose connected with the furtherance of the adventure. Whether the purpose is within the scope of the policy, is' a question for the court. The policy not limiting the time of stay, 'whether a ship has staid a reasonable time, for the,purpose, is purely a question for the jury. Langhorn v. Alnutt 4
 
 Taunt.
 
 511.