Parker C. J.
delivered the opinion of a majority of the Court. The contract of insurance which is the subject of this action, appears to have been entered into by both parties to it, with a view to the peculiar uncertainty of the voyage contemplated. All that was known of the destination of the vessel was, that she was going beyond the Cape of Good *491 Hope, into the Indian seas, for the purpose of disposing of, to the best advantage, the specie which was on board, and of purchasing therewith a cargo suitable for the markets in Europe or the United States. At what port she would be able to effect this, and how long a time would be required to accomplish it, was wholly uncertain. It is therefore obvious, that in order to procure an indemnity in case of loss, by means of an insurance, there could be. no designation of a specific port for the outward terminus of the voyage, but that the utmost latitude was necessary between Boston, the place of her departure, and the port of final discharge in Europe or the United States; and the only limitation agreed on was, that the choice of ports should exist only beyond the Cape of Good Hope, and that to whatever ports she might go, it should be for the purpose only of selling the outward and procuring a homeward cargo, that is, of exchanging the specie for such of the produce or manufactures of some In dian country, as would be suitable for markets m Europe or the United States.
But besides the uncertainty as to what port in India might be selected for the objects of the voyage, it was contemplated as possible, that upon visiting one or more of the ports, it might be found expedient to proceed to some other, in order to try the various markets in that extensive region, part of which was almost new to the commerce of this country ; and it might be found, that after making the experiment of one or more ports and proceeding to others, some which had been left afforded better markets than those which had been subsequently resorted to.
It was necessary therefore to provide, not only that the insurance should cover the voyage to any port beyond the Cape, but also to each and every one of them, one or more times, as often as the fair and honest purposes of the voyage should seem to require. The terms of the policy were well chosen and sufficiently broad to carry into effect those obvious intentions of the insured, and it must be taken for granted, as no misrepresentation or concealment of the nature of the voyage is complained of, that the underwriters were fully aware of the extent of the indemnity they had undertaken) *492 and had secured to themselves a sufficient compensation ty way of premium therefor.
They undertake to insure against, sea perils this vessel and her cargo, “ from Boston to any port or ports beyond the Cape of Good Hope, one or more times to the same port, for the purpose of selling the outward and procuring a return cargo, and at and from thence to port of final discharge in Europe or the United States, (not both,) with liberty to stop at the usual places of refreshment and to trade thereat.”
It is not easy to conceive a form of words more entirely free from ambiguity, or better calculated to answer the purpose of security against loss on such a voyage as appears to have been projected by the insured with this vessel and cargo. There having been a total loss of vessel and cargo towards the termination of the voyage, as the vessel was approaching her port of discharge, it is incumbent on the underwriter to show some legal ground to justify him in withholding the indemnity provided for in the policy.
Several grounds of defence were taken at the trial, which depending upon matter of fact have been decided by the jury in favor of the plaintiff; and a claim for a partial loss made by the plaintiff, in addition to his claim for a total loss, on account of repairs at the Isle of France made necessary by damage done to the vessel on her homeward voyage, has been settled against the plaintiff, on the ground that the damage arose from unseaworthiness of the vessel at the time of her departure from her port of lading in the island of Java. She was thoroughly repaired at the Isle of France, and the final loss was on her homeward passage.
The questions which remain to be settled are questions cf law only, arising from facts proved at the trial.
The port in the Indian seas which the master of the vesse was instructed to seek first, was on the coast of Cochin China. He went fifty or sixty miles up a river on that coast, and there found that a cargo of sugar at a satisfactory price could be obtained, but he was not able to purchase it with gold, which was all his outward cargo, Spanish dollars only being current at that place. He sailed from thence to the island of Manilla, where, having exchanged his gold for dollars, he *493 returned to Cochin China with the full expectation of obtaining a cargo of sugar there.
It is objected that Cochin China was a new place of trade, and not within the usual description of a port or ports beyond the Cape of Good Hope, and therefore ought not to be considered as within the terms or the spirit of the contract, but it is a port beyond the Cape of Good Hope, and within the Indian Ocean, and so comes within the terms of the contract. If any restriction to places of customary trade had been intended, it ought to have been expressed. Underwriters are presumed to know the nature of voyages they insure, and the éffect and extent of the provisions by which they. bind themselves, and they are not allowed to avoid a contract expressed in plain and unambiguous terms, by asserting that they meant more or less than the words import, unless they show the existence of some usage of trade, to which from its notoriety both parties are supposed to refer ; and there was no evidence in the case of any such usage.
It was also hinted, but not much pressed, that the selling of the gold at Manilla was a selling of the outward cargo, and that there was no right to return to Cochin China to purchase the sugars there ; but this was most clearly justifiable. If the cargo had been any thing but specie, and after an ineffectual attempt to sell it at the port in Cochin China, the master had proceeded with it to Manilla and there sold it for dollars, he would certainly have had a right to go back to purchase sugar with his dollars ; it would seem to be the very case contemplated as probable when the contract was entered into.
But on account of difficulties not to be foreseen or guarded against, a cargo could not be procured at Cochin China ; and the master having purchased and taken on board a small part, to wit, one eighth of a cargo, sailed from thence to Batavia, in the island of Java, with the intention and expectation of completing his cargo of sugar there. Without doubt he was under the protection of the policy until the arrival at Batavia; and it is not disputed, that from thence he might have proceeded without any deviation, to any other port within the Cape, and even back again to Manilla or Co *494 chin China, for the purpose of filling up the ship and comP^ng the cargo, if unable to procure it at a satisfactory price at Batavia. It was proved that sugar was very scarce and high there, so that the cargo could not be made up without great injury to the voyage, and that at Samarang, a place on the same island a few days sail from Batavia, it was plentiful and at a reasonable price. Without doubt he migh have gone to that place still at the risk of the underwriters, is by the law of the colony he had been permitted. But it was contrary to the law of the colony for a vessel to go, with any cargo on board, from one port to another o,f this island. It was proved that the sugar might have been purchased at Samarang, and brought in lighters to Batavia at no very considerable expense, namely, at fifty cents per picul. But the transportation of it would not have been at the risk of the underwriters, and therefore perhaps the master did not feel himself authorized to conduct the business in that mode. He might have landed his sugar at Batavia, proceeded to Samarang for the residue of his cargo, and returned to Batavia to relade what was left there, but the expense and delay would probably have rendered this unadvisable. I do not see why he might not also have shipped the sugar home on freight, in order to be able to go with an empty vessel to Samarang to procure what he certainly had not yet obtained, a return cargo. And further, if, considering the price at Samarang, it had been found for the interest of the voyage to throw overboard the small quantity which he had, in order to be at liberty to go to that place for a full cargo, I do not see why he might not have done this justifiably as it regards the underwriters.
He did however neither of these things, but finding White there, who had left Cochin China with him under similar circumstances, having part of a cargo, and who was willing to purchase what was on board of the Marmion, he sold to White the sugar which he had on board, not at a profit, but, as he states, solely to enable him to go to Samarang.
It was contended by the defendants, and this is the principal point, that this act of selling the sugar at Batavia and going from thence to Samarang, amounts to a deviation and *495 defeats the contract. The jury were instructed, that if they should find from the evidence that this sale was not made on speculation, or with a view to profit from the sale, but merely for the purpose of enabling the master to procure a full cargo foi his ship, it was justifiable and did not defeat the contract. And the question now to be decided is, whether this instruction was correct in point of law ; and this must be determined in reference to the particular terms of the contract itself.
Without doubt, under a policy in common form, insuring the vessel and cargo from Boston to some particular port in India and from thence to her port of discharge in Europe or the United States, the act of selling a part of the homeward cargo at one port and going from thence to another to take in a whole cargo, would be a deviation; and so it would to go to any other port than the one specified in the policy, without selling that part of the cargo which had been shipped. But this contract is widely different in its terms and its effect. The going to Samarang in itself was no deviation, because it is a port beyond the Cape of Good Hope. It is not necessary therefore to justify that act by showing a necessity arising from some disaster insured against. The vessel might have gone there, if permitted by the government, with her sugars on board; or under any of the circumstances before mentioned, she might have unladed the sugars and left them. So that the question is reduced to this, namely, whether the selling of the sugars, under the circumstances proved and for the cause found by the jury, vacates the policy. It certainly is not easy to discern why it should. It did not increase or even vary the risk ; the sugar sold was no longer at the risk of the underwriter; it probably was replaced by specie, and whether the underwriter continued liable for this specie on its voyage from Batavia to Samarang, is a totally different question from the one presented, which is, whether the whole policy shall be avoided. If the seven eighths of the cargo were not enough to cover the whole sum insured, a question might arise, whether, as the underwriter had borne the risk of what was shipped at Cochin China, he should be again subject to the risk of the whole cargo ; but it would be a harsh rule *496 which should determine that this act, done by the master in g°°d faith, for the furtherance of the interests of the voyage, could not in any way injure the underwriter, should deprive the insured of his whole indemnity. The fallacy of the argument on the part of the defendants consists in taking it for granted, that the going to Samarang was a deviation, unless excused on the ground of necessity ; whereas it was authorized by the contract, and the true question is, whether selling the sugar made that unlawful which otherwise would have been lawful; and this must depend, not upon proof of strict necessity for selling, but upon the purpose and intent with which the sale was made. The policy allowed the vessel to go from port to port and backwards and forwards to procure a cargo. If she went to Samarang for that purpose, the going there could be no deviation. No doubt the • policy attached when the sugar was taken on board at Cochin China as a substitute for the specie for which it was exchanged, and it continued upon the residue of the specie not expended; and there does not appear to be any difference to the underwriters, when the vessel sailed to Samarang from Batavia, whether she carried there sugar previously purchased, or the dollars for which it had been exchanged by White. They are answerable only for the sum they undertook to insure, if there were insurable interest to that amount on board of the vessel, and so long as the vessel was seeking a return cargo, they must by the terms of their contract have continued liable.
It has been said m argument, that such a construction ol the contract may render the voyage interminable, as the vessel may go backwards and forwards for ever, taking part of the cargo in one place and disposing of it in another, then return ing to the place where it was purchased or going to some other port. But such a state of things cannot be reasonably imagined, unless it can be supposed that a ship should be sent on such a distant voyage with a valuable cargo, for the very purpose of vexing the underwriters without any regard to the interest of the assured. No doubt there is a great uncertainty as to the termination of the risk under such a policy as this, but it is voluntarily assumed by the underwriter and he settles *497 his own compensation for it. It was attempted to be proved at the trial, that according to the usage of trade, under such a policy as this, selling part of the cargo was a deviation ; but the evidence wholly failed to establish the point.
We think none of the authorities which have been cited, proves that this reasoning is incorrect. Several of them (Salvador v. Hopkins, 2 Burr. 1707, — Lavabre v. Wilson, 1 Doug. 284, — Stocker v. Harris, 3 Mass. R. 415, —) go to show what constitutes a deviation, and what is required to justify or excuse one ; which for reasons before given we think are inapplicable.
The case of Grant v. Paxton, 1 Taunt. 463, is relied upon to sustain the defence. The insurance was upon goods by the Brunswick at and from China to all or any ports or places whatsoever and wheresoever in the East Indies, Persia or elsewhere beyond the Cape of Good Hope, in port, and at sea, in all places, at all times, and in all services, until the ship’s safe arrival at London. The ship sailed for Bombay with goods taken on board in China, and while at Bombay the goods were taken out, and in lieu thereof other goods were put on board to carry on the voyage from Bombay. The vessel was captured, and it was held that the insured could not recover. The reason given is, that the insurance was made upon the specific goods laden in China. In the case before us the insurance was upon cargo generally, without specifying what or where loaded ; so that the case cited is by no means parallel.
In another case of the same Grant against Delacour, (1 Taunt. 466,) on another policy on goods on board of the same vessel, the plaintiff recovered, the chief justice observing that no particular voyage was contemplated. The insurers undertook to protect the ship in any voyage which should be undertaken in that part of the world, and the distinction between the two cases is, that in the former the insurance was upon specific goods taken on board in China, and in the latter, on any goods which might be on board of the vessel; and this last case is most like the one we have under consideration. Indeed it is a full authority for our decision in this case.
*498 The ease of Beatson v. Haworth, cited from 6 T. R. 533, has no bearing on the question. The principal case determined merely, that where an insurance is to more ports than one, they must be taken in the order mentioned in the policy 3 and the case cited by Lawrence J. is a clear case of deviation.
The other cases which have been cited for the defendant establish the general rule for the construction of policies, namely, that however unlimited the privilege is in terms, with respect to visiting various ports, yet the object of such visits is to be conformable to the general purpose of the voyage. Thus in Solly v. Whitmore, 5 Barn. & Ald. 45, the vessel was insured at and from Hull to her port or ports of loading in the Baltic or Gulf of Finland, with liberty to proceed to, and touch and stay at, any port or ports whatever, for any purpose, particularly at Elsinore, without its being deemed a deviation. She touched and stayed at Elsinore to deliver goods. This was held to be a deviation, because the voyage was from Hull to her port of loading in the Baltic, and going to an intermediate port to deliver goods, was going there for a purpose wholly unconnected with the voyage. And conformable to the principle involved in the above decision, was the case of Langhorn v. Allnut t, 4 Taunt. 519 ; where the vessel was insured from London to any port or ports, place or places in the Baltic, backwards and forwards, and until the goods are safely warehoused in the house or warehouse of the consignees, with liberty to touch, stay and trade at all ports and places for all purposes whatsoever. The vessel waited more than two months at an intermediate port, for information, and then went to another port where she was seized. This was held to be no deviation, because it was for the purpose oj the voyage. Here the same objection might be raised as has been dwelt most upon in the present case, — when is the risk to cease ? if wait two months for information, why not two years ? The answer is, the jury must determine whether it was for the purpose of the voyage.
The case of Rucker et al. v. Allnutt, 15 East, 278, is of a similar character. Lord Ellenborough observed, that where the destination of the ship is certain, and the objects of the *499 voyage previously ascertained, he should have no doubt in construing the words of leave to touch and stay at any ports and places for all purposes whatever, to mean for the purposes of the voyage so ascertained, not for information in order to speculate upon the affairs of Europe ; but considering this adventure had no definite object at the time, but that the ship had to seek her port of discharge in the Baltic according to the information collected there, we must look at the general words of the leave, not as we should read them in ordinary policies upon a definite voyage, but with reference to the peculiar nature of this adventure. These observations apply with equal force to the case before us. The voyage was indefinite and uncertain, and the very object of the policy was to protect against contingencies which could not be foreseen.
The case of Gairdner v. Senhouse, 3 Taunt. 16, only settle® the rule, that under leave to touch and stay at all ports, they must be visited either in geographical order, or in the order in which they are mentioned in the policy. And the case of Hammond v. Reid, 4 Barn, & Ald. 72, affirms the principle decided in the cases of Langhorn v. Jlllnutt, and Rucker v. Jlllnutt, viz. that under such general license, the stopping will be a deviation, unless it is for the purpose of the voyage.
These are all the authorities cited for the defendant, except Emerigon (which will be hereafter noticed), and they certainly do not prove, that when the vessel arrives at a place to which she has a right under the policy to go, and there sells merchandise which had been taken on board as part of a return cargo, for the purpose of being able to obtain at less expense of time and money a complete cargo at another place, within the leave granted in the policy, and without adding to or varying the risk of the underwriters, it is a deviation ; I say again, without varying the risk, because under the policy the vessel might go to Samarang.
There are authorities, most of which have been cited on the other side, which, if not directly apposite, nevertheless settle nrinciples highly useful in the consideration of the case before us It had been considered at nisi prius by Lord Kenyon and Lord Ellenborough severally, that under policies *500 which give a license to touch and stay for refreshment, the breaking bulk in order to take out and sell any part of the cargo, avoided the contract. Stitt v. Wardell, 2 Esp. R 610; Sheriff v. Potts, 5 Esp. R. 96. This was a harsh rule, for it is obvious that this act might sometimes be done without the least delay oí the voyage, or any manner of injury to the underwriters.
These decisions were overruled by the whole Court of King’s Bench in the case of Raine v. Bell, 9 East, 195. Insurance was made on the ship from her loading ports on the coast of Spain to London, with liberty to touch and stay at any port or place whatever, without its being deemed a deviation. The vessel was obliged to put into Gibraltar, and, while there, some chests of dollars were taken on board on freight. There was no liberty to trade at the places where the vessel might stop for repairs or refreshment. The underwriters contended that the breaking bulk for the purpose of receiving the dollars, avoided the policy, but the jury having found that no additional risk or delay was occasioned, it was held that the policy was not affected thereby. Lord Ellenborough concurred with the rest of the court, although he had ruled the case otherwise at nisi prius, in conformity with his previous decision in the case of Sheriff v. Potts. I cannot conceive of a more direct overruling of a case than this, as the case of Sheriff v. Potts is referred to, and the judge himself who decided it at nisi prius concurred in overruling it. Mr. Justice Lawrence observed, “ If the doing of a thing do not alter the risk of the underwriter, and be not expressly prohibited to be done, I cannot say that it vitiates the policy.” And again he says, “ Unless it can be shown that the underwriter’s risk is varied by talcing out part of a cargo in the course of the voyage, as at present advised, I do not understand how it can avoid the policy.” Mr. Justice Le Blanc is still more precise, and at least equally strong. He says, “If a ship touch at a port which is allowed, and stay there for any reason which is allowable within the intent and meaning of the policy, and no additional risk to the underwriters be incurred by her trading there during such her stay for an allowed or justifiable cause, I can see no reason *501 why such trading should in itself avoid the policy.” Now the terms of this policy under which the vessel might go to one or more ports, one or more times, are at least as broad as the liberty to touch and stay, and what will not affect the policy in the latter case, ought not to in the former. “Neither do I think (he adds) it would be generally convenient to increase the number of small circumstances unconnected with the occasion of the loss, which will relieve the underwriters from their engagement to indemnify tire assured, by the introduction of new implied conditions which the parties do not express in the policy.”
And this case, and the principles therein settled, have been recognised and applied by the Supreme Court of the United States, in the case of Hughes v. Union Ins. Co. 3 Wheat. 159.
The case of Kane v. Columbian Ins. Co. 2 Johns. R, 264, establishes the same principle. The vessel was insured from New York to Antigua and at and from thence to Curagoa. She was forced by stress of weather into St. Croix, and she there sold part of her cargo, to the value of 3000 dollars, although only 408 dollars were wanted for repairs; but the sale took place while the vessel was repairing, and no delay being occasioned by the trading, it was held to be no ground of defence. In that case Mr. Justice Thompson put the pertinent question, (which may quite as well be put in this case,)—“Suppose the master, instead of selling the corn, had thought proper to throw it overboard; it surely will not be said, that the policy would have been thereby discharged.” So in this case, suppose the master, for the purpose of getting a full cargo at Samarang, where he had a right to go, had thrown overboard the one eighth which he brought from Cochin China,—which certainly would have been better than to return home, or perhaps even go back to Cochin China, which also he had a right to do, — would this vacate the policy ? It is asked, however, what part of a cargo shall a master have a right to sell under such circumstances ? I answer, it must be left to a jury, as it was here, whether the sale is made honestly for the necessary purpose of a voyage, or for other purposes not justifiable. The argument in the *502 defence seems to be founded upon the supposition, that the vessel had procured a return cargo at Cochin China and was proceeding on hei homeward voyage ; whereas she had only attempted to get her cargo, and she sought Batavia for the original purpose of the voyage, that is, to procure a return cargo. Not finding one there, she went to Samarang, where she obtained one. Can it be imagined that the selling one bag of sugar to raise money to pay port dues would vacate this policy ? It certainly would, if the narrow principle of the defence is admitted.
The same doctrine seems to be well established in the commercial law of France. Emerigon, tom. 2, p. 38, c. 13, § 8, says ; “ In 1761 the following question was proposed to me. James caused to be made divers assurances upon the hull and effects of the ship Colibry, some from her arrival and departure from the Isles of France and Bourbon, until her arrival at Cadiz and Bourdeaux, and others from her departure only from those islands until her arrival at Cadiz or Bourdeaux; the whole free of average, with the clause of power to touch, stay, &c. (faire échelle.) The vessel, on her return, put into St. Andero, on the coast of Biscay, about sixty leagues from Bourdeaux. Has the assured the right to discharge at St. Andero part of his merchandise, leaving on board only enough to meet the amount insured, and to order the captain to continue the voyage to Bourdeaux ? Could the assurers, in case of loss, complain of this proceeding ? I answered, that the assurers had no right to complain, provided sufficient merchandise remained on board to serve as aliment to the risk. This determination is supported by a multitude of articles of the Ordonnance de la Marine.” — “ It suffices then in all these cases, that the assured prove that he had in the ship merchandise to meet the sum insured ; whence it follows, that according to the spirit of the Ordinance, it matters not that in the course of the voyage part of the merchandise has been discharged, provided there remain in the vessel enough to answer the insurance.”
Mr. Phillips, in his valuable book on insurance, (p. 200,) has summed up the whole doctrine on this subject in very clear and intelligible terms. He says, “ A question has beet *503 made whether liberty to touch at a port involves that of staying or trading. This seems to be answered by the principles, and cases already stated ; by which it appears that the master must keep in view the purpose for which the policy gives the liberty, and also the expedition and furtherance of the adventure ; but whatever he does besides, whether he trades, or unloads and reloads his cargo; if the risks insured against, are not thereby affected, the underwriters have no ground of exception. This is the general inference authorized by the cases on this particular subject, although some of them seem to favor a different doctrine.”[1]
Now I take it to be most clearly established by these authorities, that the mere act of selling a part of the cargo, outward or homeward, at a port where the vessel has a right under the policy to be, does not avoid the policy. If delay is occasioned, or the risk is increased, or perhaps even varied thereby, such may be the consequence ; but without these effects the underwriters have no right to complain. The case furnishes no evidence of any delay, nor was the point made to the jury. The ship went to Batavia for a market, and while there seeking one, sold what cargo she had, and that not for the purpose of trading, but for the sole purpose of furthering and promoting the voyage; which was indefinite and uncertain, and therefore is analogous to that in the case cited from 9 East. I do not know but that the act might be justified under the leave granted in the policy, to touch, stay, and trade at the usual places of refreshment, but there is no need of resorting to that clause to support the verdict. Indeed we do not know judicially, that Batavia is a usual place of refreshment for vessels coming from the China seas. Under the general terms of the policy she had a right to be at Batavia, and being there, she had a right to proceed to any other port beyond the Cape of Good Hope to complete her cargo, even directly back to the one she had left. Samarang was a good market, but to be able to go there it was necessary to take from the vessel the cargo which was on *504 board. This was done for the single purpose of completing the voyage, and therefore it was justifiable
It is said that this is adding much to the risk of the underwriters, and that it will render interminable voyages which ought to have some limit, though none be prescribed in the policy ; but the rule laid down will not necessarily have that effect; as soon as the real purpose of obtaining a cargo according to the terms of the policy is abandoned, the policy is defeated.
But it has been urged, that the insurance attached upon the cargo when taken on board at Cochin China; that it was carried to Batavia at the risk of the underwriters ; and that afterwards a full cargo being obtained at Samarang, the under writers, if answerable for this, would have undergone the risk for more than the actual cargo of the ship.
This objection appears plausible, but it is unsound. It might be enough to answer, that the underwriters voluntarily made a contract which subjects them to this double hazard ; for there is no denial that the ship might have retraversed the Indian Ocean, when disappointed of the cargo at Batavia. But if this answer is not sufficient, the authorities above cited will justify the position, that the underwriters are answerable for- the whole sum insured, provided seven eighths of the cargo laded at Samarang are enough to cover the sum insured ; if they are not, then the recovery may be pro tanto; but I suppose there is no question but that the property on board exceeded the whole amount of the sun insured.
It has been said that the opinion thus expressed is contrary to that which was adopted in Keltell v. Wiggin, 13 Mass. R. 68; but this suggestion arises from the want of a critical examination of that case. That was a case of clear deviation in fact, the vessel having arrived at her port of lading, and departed to another port under a new contract with the governor of the Isle of May, to procure a cargo of provisions for his use. The question was, whether the deviation was excused by the circumstance of the master’s being able to lade his vessel sooner than he otherwise would ; and it was decided that it was no excuse; and the Court expressly and *505 repeatedly state as the ground of their decision, that the new expedition was wholly unconnected with the voyage insured. It is stated, that the vessel might have gone from island to island among the Cape de Verds for salt, which was the object of her voyage home, but her arrival at any one of them where salt was to be obtained, and where the cargo was intended to be taken on board, determined the voyage to those '"slands, and the vessel could not proceed from thence to another island for the purpose of earning a freight, or for any other purpose, under the policy. Now there the deviation was in going from the Isle of May to St. Jago without necessity, and not for the purpose of the voyage insured. But the case before us is entirely different; the being at Batavia was lawful; the going from thence to Samarang was lawful; the thing complained of is the selling some sugar at Batavia, and this is found by the jury to have been done to enable the vessel to proceed to Samarang in order to further the purpose of the voyage. The question is not therefore whether the going to Samarang was justifiable, for that was strictly within the policy, but whether the selling of the sugar was justifiable ; and it not appearing that the voyage was thereby delayed or the risk increased,.but, on the contrary, the voyage being shortened thereby, and file risk the same as it would have been if the vessel had gone to Samarang with the sugar on Doard, the policy cannot be made void by this act.

 Chase v. Eagle Ins. Co., 5 Pick. 51; Lapham v. Atlas Ins. Co , cited in 3 Phillips on Ins 172; 3 Kent’s Comm. (3d ed.) 314.