Putnam J.
dissenting. I have the satisfaction of agreeing in most of the positions which have been so fully and elaborately stated by the learned chief justice, but in regard to the transaction which took place at Batavia I am obliged to dissent.
The liberty given to the assured in this policy is very extensive as to the places to which the ship might go, but is very limited in regard to the objects of the voyage. The Marmion might go where she pleased beyond the Cape of Good Hope, and being allowed to go to the same port one or more times, she of course might go backwards and forwards as freely as if those words had been inserted in the policy. But her employment was merely to dispose of her outward, and to procure a return cargo ; and it was upon that *506 restriction that the underwriter must have relied, to calcu^ate the duration of the voyage, or the premium adequate to the risk. It was not intended to give the liberty of making intermediate voyages, or of disposing generally of what might have been received on board as return cargo. This position is not contended for by the assured. Indeed, if that liberty had been given, it would follow, that the risk would have been terminable at the will of the assured only. He might have kept the ship employed in disposing of and procuring goods, as opportunity should have presented, so long as he could have found any inducements of profit. This confessedly is not the meaning of the contract. It was limited (let it be repeated) to the purpose of disposing of the outward cargo, for a cargo to bring home ; and what should be put on board as return cargo, should have been retained as such. In this view of the case the parties had a common interest in expediting the voyage ; the assured, to save the expenses of the ship, and the underwriter, to put an end to his liability. She was obliged, I think, to keep what was loaded as return cargo, and when fully loaded, she should have proceeded with all reasonable expedition to her port of discharge.
Now it appears, that while at Saigon in Cochin China, she received on board 1000 piculs of sugar as return cargo, which there, and on her passage to Batavia, was at the risk of the underwriter. Upon her arrival at Batavia an unexpected event happened. By the commercial policy of the Dutch, the coasting trade of Java is prohibited to foreigners : and this regulation was extended to the Marmion in respect to the sugar, which she brought from Cochin China without the least intention of trading coastwise at Java. But the Dutch government adhered to the letter of their rule, and would not permit the ship to carry the sugar which she had on board, to another port in the island, where she was desirous of completing her loading. That might have been very unreasonable and vexatious, but it imposed no necessity upon the owner of the ship to dispose of the sugar at Batavia : for the government were willing to let her go with the cargo on board where she pleased, excepting only to any other port m Java, to complete the loading of her return cargo.
*507 It was then determined to dispose of the part of the return cargo, which was on board, and to proceed to Samarang, wnere it was expected a full cargo of sugar could be obtained; which expectations were realized. And this measure is justified, because done with a view to obtain a full cargo at Samarang. But, in my opinion, the assured had no more right to adopt this extraordinary mode of obtaining a cargo, than he had to proceed to some other ports or places than those mentioned in the policy, for this purpose And I think that our own decision in Kettell v. Wiggin, 13 Mass. R. 72, is a strong authority to prove my position. The insurance there was on the schooner Pocahontas and freight from Boston to Gibraltar, and from thence to her port of discharge in the United States, with liberty to proceed to St. Ubes or the Cape de Verd islands for salt. She arrived at the Isle of May, one of the Cape de Verd islands. The governor there offered to expedite her loading before her turn should come, if she would go to St. Jago and Fuego (which are two other of the Cape de Verd islands) for provisions for the Isle of May. And the jury found, under the instruction of the presiding judge, that this was done for the purpose of expediting the loading, and without any intent to deviate. But it was held to be a deviation ; and the Chief Justice, in delivering the opinion of the Court, said the usual course is to be pursued, let the consequences fall where they may. Now it seems to me, that it was as much out of the usual course, to dispose of the part of the return cargo at Batavia, with a view to procuring another more expeditiously at Samarang, as it was to go from one of the Cape de Verd islands to another, for provisions, with the view of getting a cargo of salt sooner than the vessel would have been able to do, if she had waited until the ships, which were there before, had been loaded. In each of these cases the assured was governed by the same intent, viz. the more advantageous procurement of a cargo to bring home ; but the means resorted to were unusual ; and I think the Marmion was no more under the protection of the policy, while employed in hsposing of the return cargo which she had on board at *508 Batavia, than the Pocahontas was in going from the Isle oí May to another Cape de Verd island.
The case of Solly v. Whitmore, 5 Barn. & Ald. 45, has ' some bearing upon this subject. The policy was upon a ship at and from Hull to her port or ports of loading in the Baltic sea and Gulf of Finland, with liberty to proceed to, and touch and stay at, any port or ports whatsoever, for any purpose, particularly at Elsinore, without its being deemed a deviation. The ship took in her loading at Hull, and a part of it consisted of sundry packages for Elsinore and Dantzic, which she delivered at those places ; and afterwards, while she was proceeding to her port of discharge, she was lost by the perils of the sea. And the underwriters were held discharged, because, although the ship might lawfully have touched at Elsinore and Dantzic, she had no liberty of delivering goods there ; which Abbott C. J. thought was wholly unconnected with the object of the voyage insured.
Now the object stated in the policy in question, was simply to carry and sell the outward, and purchase a homeward cargo. The selling and unloading of the homeward cargo, or any part of it, was never contemplated by the parties, and was not within the scope of the enterprise.
In the case of Stitt v. Wardell, 2 Esp. R. 610, before Lord Kenyon, an insurance upon a ship at and from White-haven to St. Michaels, and from thence to her port of discharge in the Channel, with liberty to sail to, touch and stay at any port or ports whatsoever on her passage out, was held to be vacated because the master broke bulk and sold a quantity of coals with which she was loaded, at a port where she was obliged to go by stress of weather. Lord Kenyon said, that the liberty to touch could never give the liberty of trading; that would be to make the underwriters liable beyond what they proposed to insure against. S. P. 4 Taunt. 519; 15 East, 278; 4 Barn. & Ald. 72.
So in Sheriff v. Potts, 5 Esp. R. 96, where the insurance was at and from Guernsey to Gibraltar, with liberty to touch and discharge goods at Lisbon, the policy was avoided, because the assured not only discharged but took on board a cargo for Gibraltar. Lord Ellenborough said, her taking in *509 another car» o at Lisbon is a new voyage and a new adventurc ; it is not witbin the terms of the policy.
It has been argued however, that the cases of Stitt v. Wardell an Sheriff v. Potts have been overruled by Raine v. Bell, 9 East, 195 ; and certainly two of the learned judges, Lawrence and Le Blanc, speak of them as deserving further consideration. In Raine v. Bell the policy was upon a ship and freight from her loading port in Spain to London, with liberty to touch and stay at any place whatever. She was obliged to go in at Gibraltar for provisions, and while she lay there for that purpose, she took on board some dollars, to carry to London; and she was not delayed one moment by that transaction, for they were put on board while she lay waiting for the provisions. The court decide on the ground that taking in the dollars did not vary the risk on the ship and freight. The chief justice (Lord Ellenborough), however, reserved his opinion as to the effect of that transaction, upon a policy upon goods, because, said he, “ the taking in of other goods in the course of one entire voyage, where it is not provided for, may be contended to constitute a different adventure from that, on which the ship started with her original cargo.” The policy in the case at bar was upon ship and cargo. But independently of that circumstance, if this case should be determined according to the principle settled in Raine v. Bell, it seems to me the underwriter is discharged, because the risk is materially varied. It appears that the Marmion lay at Batavia three weeks, part of which was spent in vain attempts to induce the government to relax their colonial regulations, and part in unlading the sugars which had been brought there from Cochin China. The master ascertained, as soon as he arrived at Batavia, that he could not get a cargo there. He went forty miles into the country to obtain permission to carry away the sugar ; but it was refused. The Marmion should then have elected, either to procure her loading to be brought from Samarang, or to proceed immediately to some other port than any one in the island of Java. But she determined to sell her sugars and go to Samarang in ballast. It must have taken some time tr unload and deliver the sugars, and if all *510 the rest of the time consumed at Batavia may well be ac counted for in the attempt to negotiate with the Dutch government, the delay sustained in consequence of the arrangement with Captain White for the sale and delivering of the sugars was unwarrantable. It is obvious that the ship might have been on her passage to some other port during the time she was unloading the sugars. The risk therefore has been varied. It is not true in this case, as it was in the case of Maine v. Bell, that the ship would have been detained there for some other lawful cause, if the transaction objected to had nor taken place.
But the reason why the underwriter is discharged is, not that the risk has been increased, but that the contract has not been pursued. The Supreme Court of the United States, in Maryland Ins. Co. v. Le Roy et al. 7 Cranch, 30, say “ the law attaches no importance to the degree, in cases of voluntary deviation.” And they desire not to be understood to acquiesce in the correctness of the decision of Raine v. Bell, which had been cited as supporting a contrary doctrine, and which has been much relied upon for the assured in the case at bar.
In the case of Hughes v. Union Ins. Co. 3 Wheat. 159, which was a policy upon ship and freight, at and from Teneriffe to Havana and New York, the ship had liberty to stop for a particular purpose at Matanzas, of which she availed herself ; and while there, she unladed her cargo, occasioning no delay; and the assured recovered. Marshall C. J. stated, that there was no increase of risk, no delay, no alteration of the voyage. The vessel pursued precisely the course marked out in the policy. In the case at bar the assured adopted means to procure his return cargo, which were not marked out in the policy, which did vary the risk, and which did create delay.
Suppose there had been two policies effected, one upon the ship and goods, for the purpose of disposing of the outward cargo, and another upon the ship and goods laden as the homeward cargo, at and from the ports of lading to her port of discharge in the United States, — under which policy would the assured be acting at Batavia, while delivering the sugars *511 o Whi a ? R could not be said to be within the first policy, Because the risk upon the outward voyage terminated when tne cargo carried out was disposed of. It could not be upon the homeward voyage, because the ship was not employed in loading, but in delivering and selling goods. She would seem clearly to be carrying on a new enterprise not within either policy. It might be with much less risk and more prospect of gain to the assured, but certainly not identically the original undertaking.
It has been much pressed for the assured, that the course of proceeding adopted at Batavia was not only most advantageous for him, but attended with less hazard to the underwriter, than any one which could have been adopted. Those are quicksands upon which it will not be safe to build. The underwriter has nothing to do with the terms upon which the trade is carried on, or with the impositions of the Batavian government. They do not furnish any excuse for deviating from the usual manner in which this voyage was to be conducted. If they had been foreseen, they would have been provided against in the contract. The master had a choice of difficulties, and he seems to have acted in good faith. He had disposed of the cargo which he carried out. He was to procure a return cargo ; and he must have known, that if he disposed of and unloaded as fast as he procured it, the voyage would have been interminable. He might remain at Batavia and import the sugars from Samarang in Dutch vessels, but then there would be the freight to pay, and they would not be brought to Batavia at the risk of the underwriters. In short, they would cost more on board at Batavia, than they would at Samarang. He was governed by this mercantile necessity. But he was himself apprehensive that he was departing from the usual course of proceeding, and he protested strongly against the prohibition of the government. He puts it as a case of necessity ; declares that the measure was against his own desire, but that owing to the existing laws at Batavia, and the interest of his principals, he was obliged to act in that way. And he says further, that “ he was afraid that the insurance on the vessel and cargo, by changing her destination and discharging what cargo she had previously *512 taken in, would suffer in case of accident, if he did not take proper steps for his justification.” The amount of all this jle wag doing something not according to the usual course to be done, for the purpose of procuring a return cargo ; and that is exactly what I think he had no right to do under this contract. But there was no vis major, or necessity, compelling him to depart from the usual course of proceeding.
The circumstances that the sale at Batavia was not with a view to a profit upon the sugars, and that White made nothing by his purchase, may be true ; but I think they are immaterial, and have a tendency to withdraw the mind from the true question, which is, whether the mode adopted to procure the return cargo was within the meaning of the parties as expressed in the policy. In the extended view of the affair, the sale was with a view to profit ultimately.
But what limitation is to be given to this sale of goods laden as return cargo ? If the assured are permitted to sell under the circumstances proved, the door is opened for any repeated bartering or sale of what may have been again received as return cargo, and with the same honest view to the final procurement of one which would be most advantageous to the owner. If, for example, when the ship had got to Samarang, she had obtained but a part of a loading, instead of a full loading, as might have been expected, and information bad been received that the savages at Saigon river had relented and would furnish a full cargo at half the price they demanded at first, she might well sell what she had taken at Samarang, and go back to Cochin China; and so on from port to port in that immense region, taking in and discharging, as the prospect of a successful result should offer. And as the kind of cargo was not named in the policy, I do not see but that the object might be changed for some other kind of merchandise, than that with which the loading commenced, so that she might take in indigo at Calcutta, teas at China, &c. This, it seems to be conceded, would not be within the policy, because it would be a genera, trading. I know not how to distinguish the trading that did take place, from any that might afterwards be resorted to *513 without any other necessity than was induced by the prospects of gain.
It was of no consequence to the underwriter, whether the cargo were bought cheaply or dearly, but of great consequence, that what was bought and put on board as return cargo, should be retained as such, that the voyage might come to an end when the vessel should be full. If it liad been requested of the underwriter to grant a general liberty of trading, of taking in and discharging, it is obvious that the risk and the premium would have been greatly increased ; and it is no answer to the objection, that if this particular instance of trading had been mentioned, the underwriter would probably have consented to it without any more premium. It is not the increase of risk, but the departure from the contract, that is thenceforward to discharge it.
I have expressed this dissenting opinion with freedom, but,
I desire to say, with entire respect for my learned brethren who are the majority on this question.