DECREE REVERSED, &c.

JOLLY's Adm'rs. *vs.* THE BALTIMORE EQUITABLE SOCIETY FOR INSURING HOUSES FROM LOSS BY FIRE.—June, 1827.

The strictness and nicety which have been wisely adopted, in the trial of questions arising on policies of marine insurance, are not to their full extent applicable to the policies of a fire insurance association, formed for the individual accommodation and security of its members, the risks being assumed on the knowledge acquired by an actual examination made by the officers of the company, and not on the representations coming from the assured.

Such an association cannot be viewed as involving in it a mutual relinquishment of the right of exercising those ordinary necessary acts of ownership over their houses, which have been usually exercised by the owners of such property; and, consequently, the insured is authorised to make any necessary repairs in the mode commonly pursued on such occasions; but if by gross negligence or misconduct of the workmen employed, a loss by fire ensue; or if alterations be made in the subject insured materially enhancing the risk, and not necessary to the enjoyment of the premises insured; or which, according to usage and custom, were not the result of the exercise of such ordinary acts of ownership, as in the understanding of the parties were conceded to the insured at the time of the insurance, and a loss by fire is thereby produced, then are the underwriters released from all liability to indemnify for such loss.

In the absence of any contract, or established rule of law, determining what repairs or alterations the insured was authorised to make, or whether if authorised, they were made in the usual way, the jury is the proper tribunal to decide those questions.

Alterations and additions to houses insured against fire, do not *per se* change the risk; they remain subject to the same perils, although their degree may be increased or diminished, and the jury is the proper tribunal to decide whether the risk has been increased.

APPEAL from *Baltimore* County Court. This was an action of *covenant* brought by the appellants against the appellees, the plaintiffs and defendants in the court below. The action was grounded on the policy of insurance hereinafter

mentioned. The defendants, (now appellees,) pleaded that they had not broken the covenant, &c. on which issue was joined.

At the trial the plaintiffs, (the appellants,) read in evidence the acts of 1794, *ch.* 39, granting a charter of incorporation to the defendants, and the act of 1801, *ch.* 35, a supplement to the said act of incorporation. They also offered in evidence the following policy of insurance, dated the 26th of December 1814: "*Baltimore* Equitable Society, (No. 4,106.) Whereas *William Jolly.* of *Baltimore*, in the State of *Maryland*, hath become a member of the *Baltimore Equitable Society*, *for insuring houses from loss by fire*, agreeably to the deed of settlement and act of incorporation thereof, passed by the legislature of *Maryland*, in the year of our Lord one thousand seven hundred and ninety-four, and hath paid and deposited in the hands of the treasurer of said society, nineteen dollars and thirty-three cents, the receipt whereof we do hereby acknowledge, being the full consideration for insuring him the sum of twelve hundred dollars, on the property hereinafter mentioned. Now be it known by this policy of insurance, that the said society do insure, and cause to be insured, against loss by fire, (on the terms and subject to the eventual deficiency of funds in the said deed of settlement mentioned and expressed,) the said *William Jolly*, his heirs, executors, administrators and assigns, in the sum of twelve hundred dollars, upon his brick dwelling-house, fronting on the south side of *New Church-street*, between *Charles-street* and *St. Paul's Lane*, twenty-four feet, and extending back twenty-one feet, being three stories in front, and two stories in the rear, finished in the plainest manner. This insurance to be and continue for the full term of seven years, from and after the date of these presents. And for the further security of the said insured, we, the directors of the said society, do hereby order and direct the treasurer thereof, for the time being, when and so often as the said house, or any house built in the room thereof, shall be demolished by fire, during the term of this insurance, to pay unto the said *William Jolly*, his heirs, executors. administrators or assigns, within three months after such demolition, out of the funds

of the society, the sum of twelve hundred dollars, and when and so often as the said house, or any house built in their room, or either of them, shall be damaged, injured or impaired by fire, during the said term, that the same be paid agreeably to the estimate thereof, not exceeding the sum of twelve hundred dollars, out of the funds of the society as aforesaid, or that the said buildings be repaired, and put in as good condition as they were before such damage accrued. And we do further order and direct the said treasurer, for the time being, at the expiration of this policy, to repay to the said *William Jolly,* his heirs, executors, administrators or assigns, nineteen dollars, thirty-three cents, the sum by him paid and deposited as aforesaid, together with his proportionable part of the profits of the business, (if any,) or so much of both or either of them as shall remain unappropriated, towards the payment of losses, and the necessary expenditures of the society; all which payments and repairs shall be made agreeably to the principles and provisions, and subject to the limitations and eventual deficiency of funds in the said deed of settlement mentioned and expressed. It is provided in the deed of settlement, and hereby declared, that if the said deposit money shall not be demanded at the office of the society, within one year after the expiration of this policy, that then the right of payment thereof shall cease, and the same remain sunk to the insured, for the benefit of the society. It is also provided in the deed of settlement, and is hereby declared and understood, that if the entire funds of the society should at any time be insufficient fully to pay and discharge all the losses incurred, that then and in such case a just average shall be made, and the payment to be demanded in virtue of this policy, in case of loss or damage by fire to the premises insured, shall be a dividend of the said funds in proportion to the sum insured, agreeably to the true intent and meaning of the said deed of settlement. If the premises insured in this policy are or shall be insured elsewhere, this policy to be void," &c. It was admitted that the said policy was duly executed, and that the insured was at the time the owner of the house in question. The plaintiffs also offered in evidence, that after the death of the insured, the plaintiffs, who are his administrators, duly appoint-

ed, took possession of the said house, and the same having be-
come much dilapidated, they determined to give it a thorough
repair, and in February 1820, engaged a workman to make the
repairs; that while the said repairs were going on, in March
1820 the house was set on fire by an incendiary, and damaged
in the floors, stair-cases, window frames and roof, to the value
of $600; and that due notice was given to the defendants of
the said loss, and a demand made in due form that they should
repair the damages, or pay the sum insured, according to the
policy; but the defendants refused to repair or pay the said
sum, alleging that they were not liable to be charged with ei-
ther, and have ever since refused to repair or pay the said sum
insured, or any part thereof. The plaintiffs then gave in evi-
dence, that no carpenters' or joiners' work was done in said
house for any other purpose than for repairing the said house;
that a work bench is considered by carpenters in the light of
one of their tools, and that it was usual to do the whole or the
chief part of the work at the house undergoing repairs, when
those repairs were expected or intended to be considerable;
and that the repairs made on this house as aforesaid were ne-
cessary for the purpose of rendering it tenantable. The plain-
tiffs further gave in evidence, that no repairs were ever made
upon the aforesaid house after the fire damaged it, as before set
out; but the same remained, until within four or five months
since, in a ruinous state, without being tenanted or tenantable,
when it was wholly pulled down; and that the ordinary rent
of such a house so situated, if in good repair, was at least $150
*per annum.* It was admitted that the premises insured by the
said policy were held in leasehold. The defendants then of-
fered in evidence, that the repairs made by the plaintiffs to the
house in question was a thorough repair, and made in the fol-
lowing manner—A plank floor was laid in the kitchen part of
the basement story, which floor was of brick at the time the
insurance in question was made, the old porch at the front door
was taken down, and a new one of the same description put
up; new stairs were made from the basement story, to the first
floor, new doors were made for several of the rooms, and new
window cases in some instances, put in, in the basement story.
That in order to make these repairs all the materials were tak-

en to the house in question, in a rough state, and were there dressed and fashioned in the usual manner; a work bench and the necessary tools were carried to the house for the purpose of doing the work; that before the fire in question took place, the workmen had been engaged in making the repairs from four to six weeks; that during that time nobody lived in the house, and the chips and shavings and fragments of wood, produced by the work of the joiners or carpenters, were lying about the house, nor had it been occupied for some weeks previously thereto, the same having been suffered by the owners to be untenantable for want of repairs. That the materials were dressed and fashioned in a room on the first floor above the basement story, where the work bench was placed, and the floor of that room was covered with shavings and fragments of plank and seasoned wood, and that it was in this room the fire commenced. And the witness proved, that there was reason to believe that the fire which consumed the premises had been introduced through the broken window, among the shavings within, as the interior of the building was more accessible in that way than any other. The defendants then prayed the direction of the court to the jury, that if the jury should find the evidence as above stated in this exception to be true, then the plaintiffs were not entitled to recover. Which opinion and direction the Court, [*Archer*, Ch. J.] gave to the jury. The plaintiffs excepted; and the verdict and judgment being against them, they appealed to this court.

The cause was argued at the 'ast June term before BUCHANAN, Ch. J. and EARLE and DORSEY, J.

*Williams*, (District Attorney of *U. S.*) for the Appellants, contended,

1. That the repairs, which are described in the bill of exceptions as going on, in regard to the house insured, and the necessary occupancy thereof by the carpenter and his tools, were no violation of the terms of the policy of insurance, but were entirely consistent with the contract between the parties.

2. That the court below erred in giving an *absolute* direction to the jury that the plaintiffs were not entitled to recover, instead of leaving it to the jury to say by their verdict, whe-

ther the risk of the insurers was so enhanced by the repairs, that the defendants were not liable on the policy to indemnify the insured for the loss by fire, which happened to the premises.

On the *first* point, he referred to the act incorporating the appellees, 1794, *ch.* 39, *s.* 1, *Art.* 28, 32. 1 *Marsh.* 185, 200. *Taylor vs Curtis,* 3 *Serg. & Low.* 69.

On the *second* point, he cited 1 *Stark. Evid.* 409, 410, &c. 1 *Marsh.* 469, *(note,)* 470, *(and note,)* 473, *(note b.)* *Livingston vs Maryland Insurance Company,* 6 *Cranch,* 279. 1 *Phill Evid.* 13, *(note,)* 128. *Hucks vs Thornton,* 3 *Serg. & Low.* 15. *Duff vs Budd,* 7 *Serg. & Low.* 399. *Laidlaw vs Organ,* 2 *Wheat.* 178. *Roach vs Pendergast,* 3 *Harr. & Johns.* 33. *Athey's Ex'x. vs Collins,* 7 *Harr. & Johns.* 213.

*Wirt,* (Attorney General of *U. S.*) and *Taney,* for the Appellees, on the *first* point, cited *Maryland Insurance Company vs Le Roy,* 7 *Cranch,* 26.

On the *second* point, they cited 1 *Stark. Evid.* 416, 417.

*Curia adv. vult.*

DORSEY, J. at the present term, delivered the opinion of the Court. The *Baltimore Equitable Society for Insuring Houses from loss by fire,* being a private association formed by owners of houses in the city of *Baltimore,* by which, collectively, they agree to contribute to the payment of all losses by fire, by them individually sustained, it appears reasonable that their policies should receive a fair and liberal construction, free from all captious technical exceptions.

The strictness and nicety which have been wisely adopted in the trial of questions arising on policies of *Marine Insurance* are not, to their full extent, applicable to the policies of this society. The former are entered into by the assurer almost exclusively on the statements and information given by the assured himself; in the latter case the insurers assume the risk on the knowledge acquired by an actual survey and examination made by themselves, not on representations coming from the insured. This association, therefore, formed for their individual accommodation and security, cannot, upon any sound principles of construction, be viewed as involving in it a mutual relinquishment of the right of exercising those ordinary,

necessary acts of ownership over their houses, which have been usually exercised by the owners of such property. It hence follows, that the insured is authorised to make any necessary repairs in the mode commonly pursued on such occasions. But if, by the gross negligence or misconduct of the workmen employed, a loss by fire ensue; or if alterations be made in the subject insured materially enhancing the risk, and not necessary to the enjoyment of the premises insured, or according to usage and custom were not the result of the exercise of such ordinary acts of ownership, as in the understanding of the parties were conceded to the insured at the time of insurance, and a loss by fire is thereby produced; then are the underwriters released from all liability to indemnify for such loss. The policy of insurance here being perfectly silent on the subject, and no general principle or rule of law having been established, in cases like the present, by which to determine, whether the repairs or alterations were such as the insured had authority to make as being necessary to the user of the property; and whether, if authorised, they were made in the usual and customary way, the proper tribunal, to decide those questions, is the jury, and not the court.

It appears to have been conceded in argument, that ordinary, necessary repairs might be made by the insured; but not a thorough repair like the present. The proof of the appellants is "that the repairs made on this house were necessary for the purpose of rendering it tenantable," and that they were made in the usual way. The bill of exceptions shows, that by the word "repairs" both parties meant all that was done to the house. The distinction attempted to be taken has not been supported by any authorities, and in common sense and justice, there can be no discrimination between the right to make ordinary repairs, and such a thorough repair as is necessary for the purpose of rendering the house tenantable.

It has been stated by the counsel of both parties, that there can be found in the books no adjudication on a policy against fire analogous to the present. It becomes this court, then, maturely to deliberate before they sanction the doctrine contended for by the appellees, which, contrary to justice and the understanding and intention of the parties at the formation of

their contract, annihilates all claim to indemnity on the part of the insured, and yet leaves the insurer in the full enjoyment of the premium for responsibility.   It perhaps scarcely ever happens, that during the period of seven years, the usual term to which such policies are limited, some trifling alteration or addition is not made to the property insured; as a new door or window opened, an additional closet, shelf, or such like fixture erected.   Any of which acts, if the grounds assumed by the appellees are supported, change the identity of the property, create a new risk, and absolve the underwriters.   Indeed, if alterations and additions are *per se* a change of the risk, it would follow, that the erection of a parapet wall in a city, a substitution of brick for a wooden floor, or a marble for a wooden mantlepiece, or the introduction of a coal-grate in a chimney constructed for wood as the only fuel, though lessening the peril would discharge the policy; as, according to the principles of maritime insurance, every *change of the* risk exonerates the underwriter, whether the danger be increased or diminished, or happen the loss from whatsoever cause it may.   To infer, without any express provision or necessary implication arising out of the contract itself, or public policy demanding it, that the insured surrendered all right to make such common place, trivial, unimportant additions to, and alterations of his property, as its safety or his convenience or comfort might suggest, is a construction too rigorous to be rational.   The effect of which would be to render worse than useless those most useful and indispensable institutions in populous cities—the Fire Insurance Companies, and give a fatal stab to our enterprising manufacturers.   Who, if suing for a loss under a policy covering the manufactory and machinery, would be turned out of court without remedy or hope, if perchance the insurer could prove that the most immaterial alteration or improvement were made in his machinery by substituting the power of the screw for that of the lever, the leather strap for the iron wheel, or the iron for the wooden shaft.   But suppose all the rules of marine insurance applicable to the question at bar, can a case be found in which it was ever contended that to add to the equipment of a vessel insured a yard more of canvass, or an additional cleet or clew line, was to vacate the insurance?

The numerous and warmly litigated questions of deviation and change of risk, which burthen the records of courts of justice, bear no analogy to that now under consideration. There, departing from the course of the voyage, or performing it at any other time than that required by the policy, subjects the vessel to different perils than those contemplated by the contracting parties; a flaw, a whirlpool, a breaker, may be encountered in one course of the voyage, which would be a cause of neither danger nor alarm at a mile's distance. The tempests or casualties attending the performance of a voyage to-day, bear no similitude or proportion to those attendant on a like voyage of to-morrow. But no such total revolution is wrought in the perils to a house insured against fire, which has undergone alterations or repairs; it remains subject to the same perils, although their degree may be increased or diminished. It becomes a question of *increase,* not of *change* of risk, for the ascertainment of which the jury, and not the court, is the proper tribunal.

The only authority which was strongly relied on by the appellees' counsel, and which was pressed as strictly analogous to the case before the court, was that of *The Maryland Insurance Company vs Le Roy, and others,* 7 *Cranch,* 26, which was considered as turning, not upon the common principle of deviation, but upon the ground of a forfeiture of the insurance by a change of the cargo insured. The suit there instituted was upon a policy on the *ship,* and the right to recover, therefore, could not be affected by any change in the cargo, unless the risk were increased, or it were a violation of an express warranty. The supreme court, in reversing the judgment of the circuit court, negative the idea that their decision was bottomed on an increase of risk, and furnish not the slightest pretext for placing it on the ground of an express warranty. It cannot, therefore, be viewed as determining any other than the familiar question of deviation; and although the reasoning of the court is not marked with that precision and perspicuity, which is usually displayed by the learned judge, by whom the opinion was pronounced, yet great reluctance would be felt in putting a different construction upon it, after an examination of

the authorities on the subject, the facts in the cause, and the grounds upon which the reversal was claimed. The ship was insured "at and from *New York*, to five ports on the coast of *Africa*, between *Castle D'Elmina* and *Cape Lopez*, including those ports, with liberty of touching and trading at all or any of said ports backwards and forwards, and at and from her last port on the coast to *New York*; with liberty of touching at the *Cape de Verds*, on her return passage, for stock, and to take in water." The declaration was for a total loss by the perils of the sea; and the bill of exceptions, among other facts, stated, "that the ship, in the prosecution of her voyage, arrived at the island of *Fogo*, one of the *Cape de Verd Islands*, on the 7th of May 1805, where the captain received on board four bullocks and four jack asses, besides water and other provisions, and unstowed the dry goods, and broke open two bales, and took out forty pieces of each for trade. That the ship remained there until the 24th of May. That the time generally employed by a vessel in taking in stock and water at the *Cape de Verd Islands*, is from two to three days, unless the weather should be very unfavourable; that the weather was good; and that the bullocks and jack asses encumbered the deck much more than small stock would have done." Upon these facts the court were prayed to instruct the jury, that the taking the jack asses on board the ship, while she lay at the *Island Fogo*, was not within the privilege allowed to the insured to touch at the *Cape de Verd Islands*, in the performance of the voyage insured, for the purchase of stock, and to take in water, and therefore vitiates the policy; which direction the court refused to give; but the court directed the jury, that the taking in the four jack asses at the island as aforesaid, did not avoid the policy unless the risk was thereby increased. To this direction an exception was taken; and Mr. *Pinkney*, in showing error, alleges "that the court refused to say that the taking in of the jack asses discharged the underwriters, although it might produce delay. It is not stated that it did not produce delay, and the evidence shows that it did. The principle of deviation is not increase of risk, but *delay*. If, therefore, here was any delay, the policy was void from that time." By thus arguing, that eminent lawyer ad-

mits that the policy was not vacated by the simple fact of taking the jack asses on board, but by the delay at the *Island of Fogo*, for which delay no other reason was assigned. Indeed, when we advert to the facts in the cause, that the ship remained fourteen days at *Fogo* without pretext or apology for so doing, it is difficult to imagine how a momentary doubt could exist on the question of deviation. And it is much more difficult to comprehend why an objection so obviously fatal to the claims of the insured, should, by the prayer of the underwriters, be so loosely and indistinctly presented for decision to the court below. That the supreme court, by whom it was decided, view this case as turning principally on the point on which it is here made to depend, is manifest from the review taken of it by Chief Justice *Marshall*, in *Hughes vs Union Ins. Co.* 3 *Wheat.* 166. He says, "the assured traded, and the delay was considerable and unnecessary; the risk, if not increased, might be and certainly was varied." But admit that the interpretation which has been given by the appellees' counsel to the case of *The Maryland Ins. Co. vs Le Roy, and others,* be correct, and that the court there decided that the taking on board the jack asses, whether it caused delay or increased the risk or not, discharged the underwriters, this court should not follow a decision at war with reason, justice and public policy, which is bottomed on a *nisi prius* determination, long since acknowledged by its author to have been overruled; and which is inconsistent with numerous decisions of tribunals of the highest authority made after argument and due deliberation. Among which may be numbered the cases of *Raine vs. Bell,* 9 *East,* 195. *Kane vs Columbian Ins. Co.* 2 *Johns. Rep.* 264. *Cormack vs Gladstone,* 11 *East,* 347. *Laroche vs Oswin,* 12 *East,* 131. *Kingston vs Girard,* 4 *Dallas,* 274; and *Hughes vs Union Ins. Co.* 3 *Wheat.* 159.

The case of *Stetson vs The Massachusetts Fire Ins. Co.* 4 *Mass. Rep.* 330, (not cited in the argument) though not containing the same facts, yet presented for decision a question, which in principle cannot be distinguished from that now before the court. In his proposals for insurance *Stetson* represents his house, (on which insurance was required,) as connected with other buildings on one side only; and such at the time was the

fact. Under the authority derived from the insured a frame building was subsequently erected and joined to the house insured, so that it became connected, in relation to other buildings, on two of its sides. It was afterwards consumed by fire, together with the building annexed to it.   By one of the articles of the company (to the operation of which all persons contracting with them are subjected,) it is provided that the insurer may declare the policy null and void in all cases where the insured shall have repaired or enlarged a building, and thereby rendered the risk greater.  The question submitted was in effect, whether the court could *ex natura rei* pronounce the erection of the frame building an increase of risk, or whether that fact were a matter to be found by a jury.   The learned judge, by whom the opinion of the court was pronounced, states, "that the question may be examined upon general principles, and upon the terms of the contract."  In considering it on general principles he states, that "if every the least alteration or enlargement of a building insured against fire is necessarily and of course material to the risk, and whenever it is made by the act or consent of the insured, is to vacate the policy, unless it should be renewed by the insurer, so close a restraint upon the party would place contracts of this kind in a state of complete uncertainty, and would render them so inconvenient as wholly to prevent them."   That "the true reason why in a case of marine insurance, a deviation discharges the insurer, is not the increase of the risk, but that the party contracting has voluntarily substituted another voyage for that which was insured. This change of the voyage determines the contract from the time it happens. The same strictness is not requisite in an insurance against fire, where the building, although enlarged or repaired, remains the same: and it is only necessary to guard the insurer from an increase of risk, by an alteration of the building insured."  He further states, that it is obvious that "an alteration may diminish and not increase the risk; and if this may be reasonably supposed in any case, then, whether the enlargement of a building insured has increased the risk of the insurer, is a question of fact to be determined by the jury."

It should not be forgotten, that there is no express stipulation restricting the insured as to the acts of ownership he may ex-

ercise over his property, or the repairs or alterations he may cause it to undergo. All restraints of this character, therefore, arise from necessary implication, founded on the presumed intentions and understanding of the parties; and are such as are called for by the dictates of reason, justice or public policy. Apply this doctrine to the case at bar, as exhibited in the appellants' proof, the truth of which must be conceded in granting the prayer of the appellees. All the work was done in the usual manner, and was necessary to render the house tenantable. The insurer, before he assumed the risk, viewed the property, examined its condition, considered all the casualties and incidents to which it might be liable, and, until the contrary is proved, is presumed to be as cognizant of these matters as the insured himself. Did he not know that the insured intended to derive benefit from the use and occupation of his house; that he contemplated keeping it in a tenantable condition? If so, does not reason, justice, and the understanding of the parties, revolt at the idea of an implication which should wrest from the insured the enjoyment of those important, invaluable rights, for the security of which, or an equivalent therefor, the very contract of insurance itself was effected? Nay, does not common sense, public policy, and fair dealing between man and man, demand that you should consider it as having been the intention of the parties, and as of the very essence of the contract, that the insured should exercise such acts of ownership over his property, as were necessary to keep it in tenantable condition?

This being a case in which the intervention of a jury was indispensably necessary to adjust the rights of the contending parties, the county court erred in granting the prayer of the appellees, that the appellants were not entitled to recover; for which their judgment should be reversed.

JUDGMENT REVERSED, AND PROCEDENDO AWARDED.