# William Allen *vs.* The Mutual Fire Insurance Company in Harford County.

The construction of the act of incorporation of the appellee, and its supplements.

The company has a right to insure personal property, although the principal object of the charter, was to create a mutual insurance company, and notwithstanding its provisions, that the premium notes are to be a lien on the land insured. The charter authorising an insurance of any kind of property.

Where words in a statute are express, plain and clear, they ought to be understood according to their natural and genuine signification, unless by such exposition a contradiction, or inconsistency, would arise, by reason of some subsequent clause, whence it might be inferred that the intent of the legislature was otherwise.

It is not true that from the very nature of mutual insurance fire companies, they must be confined to real estate only, or to land, in which the party insured had such a title, as would enable him to create a lien on the same

THIS is an appeal from Harford county court, in an action upon a policy of insurance, in which the appellant was the plaintiff. Verdict was rendered for the defendant.

The policy of insurance was dated 6th January 1845.—A mill situated in Harford county and which was thereby insured, was accidentally destroyed by fire 21st April 1847. Allen had paid the interest on his premium note, and the plaintiff insists that the policy remained in full force at the time of the fire.

According to the testimony, embodied in a bill of exceptions, Allen had commenced some improvements on the mill which was insured, a short time previously to the fire, and was making those improvements at the time of its destruction. Those improvements, it was supposed, occasioned no "material increase of risk." Allen, however, applied for a written permission to make such improvements, as provided by the eighth article of the conditions annexed to the policy. That article was in these words:- " In case of any material increase of risk to the property insured, such increase of risk must be notified to the company, and written permission therefor obtained from the secretary; for which such charge as may be proper must be paid." This written permission the plaintiff did not obtain, as he alleged, from the negligence or misconduct of the defendant, or the secretary, and offered testimony to that effect.

Allen made title to the premises, and insisted that he had such as would enable him to enter into said policy. He had been appointed in 1844, by Harford county court, a trustee to sell the property, and had sold the same; but at the time of the execution of the policy, neither the purchase money was paid nor the sale ratified. The *legal* title therefore, it was insisted, was in the plaintiff.

2. Allen had also a personal pecuniary interest in the premises, he having been the owner of the property, and a part of the purchase money due to him being unpaid. 3. He was the

executor of E. N. Allen, and his estate had a similar claim. 4. He had also an interest, as trustee as aforesaid, because of the commission to which he was entitled upon the amount for which he sold the property.

The prayers on the part of the defendant were :

1st. If the jury believed the foregoing facts, then that the plaintiff has no such title as would enable him to enter into said policy or contract of insurance, and that the plaintiff cannot recover.

2nd. If the jury shall find from the evidence in the cause, that the policy sued on in this case was underwritten, and before the fire the plaintiff caused certain improvements or alterations to be made on the property insured, and shall further find that such improvements or alterations, either in themselves, or during their progress to completion, occasioned any additional risk to the property insured, then the plaintiff is not entitled to recover in this action, he not having shown that the permission provided for by the terms of the eighth condition of the policy had been first given.

Plaintiff's prayer was, That if the jury find from the evidence that there was a material increase of risk, and that the plaintiff had used all reasonable efforts to notify such increase of risk to the defendant, and to obtain written permission therefor from the secretary, but that he had failed to obtain such permission through the negligence or misconduct of the defendant or its secretary, then such failure to obtain a written permit will not affect the plaintiff's right to recover.

The court granted the prayer of the defendant, and refused to give the instruction asked by the plaintiff. The plaintiff excepted.

This case was argued before ECCLESTON, TUCK and MASON, J.

By *Yellott* for appellant, and *Otho Scott* for the appellee.

15    v.2

*Yellott:* Upon what grounds does the company refuse to pay this policy? Allen, it is said, had no insurable interest in this property.

1844, chap. 214, 229. Charter of the company and a supplement to it. The company had unlimited power to insure any property, real, personal, or mixed. Premium notes lien on real estate.

At common law a person might insure, without having any interest until 19 Geo. 2, ch. 2, which applied to marine insurances. Then by George 3, ch. 3, it was required that the party should have some interest.

What title constitutes an insurable interest. 1 *Phil.*, *p.* 70. 1*st Peters*, 171. It must be a substantial interest in the property. 1 *Phil.*, 105, 107, 108, 114. Some one had power, to insure in this case. The company had power to insure, and Allen was the proper, and indeed only person, to insure.

*Hildyard on Ins.*, (*4 Law Lib.,*) 22, 23. 8 *H. & G.*, 21. 1 *Phil. on Ins.*, 168, 169.

Is there any special provision in the charter which prevented Allen from insuring?

1 *H. & G.*, 295. Not the same strictness in those cases as in marine insurances. In the latter, any, though slightest deviation, is fatal.

2 *G. & J.*, 159. 1 *Duer*, 161. Policies of this description are to be liberally construed.

4th sect. of 1842, ch. 214, may be relied on by the appellee—the remedy there given is merely cumulative, 10th sect. gives the amplest remedies.

Because of the increased risk, can the defendant insist that it is not bound to pay? This increased risk, (if material,) must be made known to the company.

The party insured has a right to make ordinary improvements. *Ellis on Ins.*, 58, 60, (*in 4th Law Lib.,*) refers to 6 *Taunt.*, 436. 22 *Eng. C. L. R.*, 260, (*top.*) 1 *Sumner's C. C. R.*, *p.* 434, *sect.* 440, 6 *Wend.*, 623. The secretary kept no office—application was made to the secretary. *Platt*

*on Covenants,* 595, 597, *(in 3rd Law Lib.)* 4 *Barb., (N. Y.,)* 815.

*Scott* for appellee :

The case arises exclusively on the charter and by-laws of the company. Had Allen such an interest in this property as would authorise him to insure *in this office ?*

This is an insurance company of a peculiar character. It insures the property of corporators. Notes not extinguished by being paid. Fires might occur, the losses in consequence of which, might exceed the amount of the premium notes.

It was never designed to insure any other than real property, that on which the notes would be a lien.—*See* the charter, fourth section. The note operates as a mortgage of real estate to pay it.

If one comes in professing to pledge property, which he had no right to pledge, it is a fraud on the corporators. It is the fee-simple which gives him a right to become a member, and, of course, to insure. The application implies, until he expressly declares to the contrary, that he has the fee-simple. Other companies can insure any interest, and to them any one might go and insure his (however small) interest in the land. Neither the sale to Allen, nor the sale by him as trustee, enabled him to give a lien on the land.

Any increase of risk was to be notified to the company, and a further premium to be paid. He proposed to introduce new machinery, and alter the character of his mill. *Additional,* was something beyond the ordinary use of the property. How could there be additional risk, that is, something more than the ordinary risk, and yet be no material risk?

The office of the secretary, was his home.

ECCLESTON, J., delivered the opinion of the court.

This suit was instituted upon a policy, dated the 6th of January 1845, in which the defendants contracted to insure the plaintiff against all loss or damage by fire, that might happen to a "store and frame" grist mill, valued at $850,

and a saw mill with a chair shop, and small sitting room attached, valued at $200.

The plaintiff gave his promissory note for the premium, as required by the company; and regularly paid the interest thereon.

On the night of the 21st of April 1847, the grist mill was accidently destroyed by fire. Due notice of which was given; and the defendants refusing to pay the loss, this action was commenced. At the trial, the plaintiff's claim was resisted on two grounds, which are to be found in two instructions, granted by the court, at the instance of the defendants.

1st. If the jury should believe the evidence, then the plaintiff had no such title in the said mills and premises, as would enable him to enter into said policy, or contract of insurance, and therefore, could not recover.

2nd. If the jury should find from the evidence, that after the policy sued on was underwritten, and before the fire, the plaintiff caused certain improvements, or alterations, to be made on the property insured; and should further find, that such improvements, or alterations, either in themselves, or during their progress of completion, occasioned any additional increase of risk to the property insured, then the plaintiff was not entitled to recover, he not having shown, that the permission, provided for by the terms of the eighth condition of the policy, had been first given.

In the argument upon the first instruction, it was urged on the part of the defendants, that this institution is unlike an ordinary fire insurance company, where the capital consists of money paid in by the insured, and invested by the company. The one under consideration, is a kind of partnership, in which the members mutually insure each others buildings, at certain estimated values. And the property thus insured must stand pledged to secure the payment of such sum or sums, as the owners may be required to pay, according to the regulations of the company, for the purpose of making good any losses which may occur from time to time. And as the second section of the original act of incorporation makes the

premium notes, liens upon real estate only, it is contended, that this company cannot insure personal property, but is confined to such real estate, as the assured can create a valid lien upon, to the extent of the obligation imposed on him by his premium note. In aid of this view of the subject, reference has been made to the supplement of 1843, ch. 225, and to the 3rd and 6th sections of the supplement of 1849, ch. 173. The first provides, that any guardian of an infant may insure, under the original act, any houses or buildings owned by the ward or wards of such guardian; and that the insurance shall be a lien, with the same effect as if the minors were of full age, and had made the insurance themselves.

The 3rd section of the latter supplement, is, "that it shall and may be lawful for any person, possessed of a life estate in real property, or any person holding such property, in trust, to insure the same in said company; and that the premium note, given for such insurance, shall be a lien upon such property."

The 6th section referred to, makes provision, that a *feme covert*, with the consent of her husband, may insure her real estate, and the premium note given by them jointly, shall be a lien on the same.

These acts were not resorted to, for the purpose of showing that any powers or authority, given in the charter, have been abridged or reduced by them. But they were used as legislative authority, for the construction claimed by the appellees. Experience, however, has taught us to believe, that legislative construction of a prior statute, is not always to be relied upon as a safe guide. And on the present occasion it is by no means certain, that the appellees are right, in the belief, that the legislative interpretation of the original act, as manifested by the supplements, is the same which they insist upon.

When the charter declared, that premium notes should be liens upon real estate, it cannot be supposed, that a lien should exist, in any case, where the title of the party would not enable him to create one by deed or otherwise. These supplements were passed, with a view of authorising certain

classes of persons to create liens for insurance purposes, who previously, had no such power, or who, it is presumed, the legislature supposed, had not the power. This seems to have been their chief design. And as the charter gave liens upon real estate only, the subsequent acts were also confined to the same species of property. If it be supposed, that because it is said in the supplements, the persons named *may insure*, they, therefore, had no such right previously, this is certainly a mistake in one instance, at least, if not in more. A tenant for life surely had the right; even according to the construction of the charter, claimed by the appellees. His life estate being a freehold, is reality, and his premium note would have been a lien to that extent. How far this last act extends the lien in such a case, it is not necessary now to decide.

But even assuming that the supplements were passed, under the impression that the construction of the original act, contended for by the appellees, is correct, we cannot yield our assent to its correctness. For we consider it in direct conflict with the plain and obvious meaning of the first section, which is not contradicted or controlled by any subsequent clause or section.

In the act of 1842, ch. 214, which is the original charter, we find given to the company, in the first section, "full power and·authority to make insurances on any kind of property, against loss and damage by fire." More ample powers to make insurances, could not well have been given. The language used, is abundantly comprehensive, to include both real and personal estate, and all such interests in either, as the well settled principles of law recognise to be insurable interests. The grant is without any express limitation, qualification, or restriction; and the subject legislated upon being that of insurance, the language must be construed according to the established rules of the insurance law, unless they are controlled by some other part of this charter. This, it has been contended, is done by the fourth section, which makes the premium notes liens upon real estate only. The portion of the section referred to, is: "That all premium notes, notes of

hand, or other evidences of debt, held by the said company, which shall have been given thereto for premiums for insurance, or for any part or parts of said premiums, shall constitute and be deemed a lien on any real estate which may be insured, in consideration, or part consideration, of such notes or evidences of debt; which real estate shall be held liable for the full and just payment of such notes, or evidences of debt, either wholly or in part, at such time or times as the president and directors shall demand." It is difficult to perceive, how this can aid the argument in defence. A lien on realty only, is created; but then it seems to provide for a case in which the insured may be indebted to the company, and may give his note for something besides an insurance on real estate, upon which a lien may be created by him. For the note is made a lien "on any real estate which may be insured in consideration, *or part consideration* of such notes." It is true, that this language might be applicable to a policy, including several parcels of real estate. But it would apply as well to a case where the note was given for premiums, under a policy of insurance, upon both personal and real estate. And it may very justly be supposed, the legislature had such a case in contemplation, after having given, in the first section, unlimited power to insure *any kind of property.* Confining the liens to realty, affords an argument in favor of the belief, that the legislature certainly intended to authorise insurances upon personalty and realty both. If they had supposed that by creating a mutual fire insurance company, they were conferring power to insure real estate only, they would not have considered it necessary, when providing for liens, to confine them by express language to real estate. Under such circumstances, it would have been quite sufficient, and perfectly correct to have said, the notes shall be liens upon the property insured. But under the supposition that they were giving authority to insure all kinds of property, and only designed making liens on realty, such language as that used in the fourth section, might well have been expected.

In case of failure to pay any of the notes mentioned in the

fourth section, when demanded, provision is made that "the said president and directors may proceed to collect the same, or any part thereof, in the same manner as in the foreclosure of a mortgage on real estate, the said notes or evidences of debt to be held and deemed as a mortgage on such real estate."

Whenever a loss shall occur, the company are authorised, by the tenth section, to ascertain the proportion which each member is to pay, and after causing a statement thereof to be made, the members are to have notice of the same; and if at the expiration of sixty days from the date of such notice, any member shall fail to pay his contribution, the directors may file such statement in the office of the clerk of the county, and may "cause execution to issue for the said proportion, in the same manner as if a judgment had been rendered for the same, together with all costs incident to such proceeding." In this provision for a summary process of collection, the general and unrestricted language which includes all members of the corporation, would include any premium notes not liens on real estate, and therefore this section is perfectly consistent with the general power in the first, to insure *any kind of property.* In truth, there is no part of the charter in which the language is not in harmony with the unlimited authority which we have conceived to be granted in the first section.

The exposition of this statute, as insisted upon by the appellees, requires us to limit or restrict the meaning of the words "any kind of property," so as to include real estate only, and such real estate as the insured can bind by a valid lien. This is clearly what is asked of us. For they contend, that the present policy is void, because the appellant had not such a title to the property, included therein, as he could give a lien upon, the company having no authority to insure in such a case. To acquiesce in this view of the statute, would violate one of the plainest, well settled, rules of construction. In 6 *Bac. Ab.,* 380, *title Statute, letter I,* it is said: "Where words in a statute are express, plain and clear, the words ought to be understood according to their genuine and natural signification and import, unless by such exposition a contra-

diction or inconsistency would arise in the statute, by reason of some subsequent clause, from whence it might be inferred that the intent of the parliament was otherwise." According to *Jacobs' Law Dic.*, *5th vol.*, *p.* 332, *Property* is, "The highest right a man can have to anything; being used for that right which one hath to lands or tenements, goods or chattels, which no way depend on another man's curtesy." Surely, then, the words "any kind of property," if construed "according to their genuine and natural signification and import," will include more than real estate, on which a party proposing to insure can create a lien. And it will be a difficult task, to point out any subsequent clause of the act, contradictory to, or inconsistent with, such an exposition, as will justify an inference that the legislature had a different intent.

The appellees' interpretation has been pressed upon us, as necessary for the security and protection of the members of the company, and, indeed, to secure the very existence of the company itself. Assuming it to be vitally important, that such institutions should only insure where they can have their premium notes secured by liens on realty, where is the absolute necessity of having them thus restricted and limited in their charters? They can at any time regulate the matter in their by-laws, or by the conditions annexed to their policies. But how are they subject to any very great hazard, even whilst the kind of property to be insured is left discretionary? The officers have the privilege, in fact it is their duty, if not already fully informed on the subject, when application is made for an insurance, to inquire into and ascertain the circumstances of the party, the nature and amount of property to be insured, as also the title to the same. And if an insurance is effected on property, the premium note for which is not a lien, but the insured is considered perfectly good for the amount, being a man of large means, should it afterwards, at any time, be even suspected that the party is becoming, in any degree, less responsible than at first, the company, (this one at least, by express provision,) can revoke the contract. And if, in the mean time, a loss has occurred, rendering it

16    v.2

necessary to call upon the members for contribution, the tenth section of the charter affords an exceedingly prompt method of compelling payment.

Although it was contended in argument, that from the very nature of mutual fire insurance companies, they must be confined to real estate only, and that no policy ought to be valid, unless accompanied ·by an actual lien; and that such regulations are so necessarily inherent in institutions of this sort, as to demand a construction of the present charter accordingly, still we find a different doctrine held elsewhere. In *Addison and Clendenin, vs. The Kentucky and Louisville Insurance Company*, 7 *B. Monroe*, 470, there is a decision upon the charter of a mutual fire insurance company, in which they are authorised to insure real and personal property. The insurance was on a flour-mill. The assured held a lien upon it for a debt due to them, and one question was, whether they had such an interest, as authorised them to effect an insurance? It was held they had. There it appears to have been contended, that the owner of the mill, alone, could have it insured, and that a person merely holding a lien upon it, to secure the payment of a debt, could not effect an insurance on the property. But the court thought otherwise.

The counsel for the appellees thinks it would be great injustice to the members of this company not to hold this policy void, for the reason, that they have pledged their real estate to secure the appellant against loss by fire, whilst he has pledged nothing to them in return, but his personal responsibility. There is nothing, however, in the record tending to show that the facts are, as here stated, in regard to the pledges given. Speaking from the record, we are not authorised to say, whether there may or may not be many policies similar to the present.

If, as has been suggested, the company would be subjected to much inconvenience, by considering such policies as this binding upon them, a contrary decision would subject the assured to quite as great, if not much greater, inconvenience. In the latter view of the subject, it might very well happen

that a wealthy man, well known to the company as such, should apply for an insurance upon property in which he had an interest, but not such a title as would enable him to create a lien on the same. The company, having full confidence in the ability of the party to meet all his engagements, make no inquiry in regard to his title, and he says nothing on that subject. The insurance is effected. For many years in succession the interest on the premium note is regularly paid. And to satisfy losses by fire, it may be that the principal of the note has been paid several times. Finally, the insured property is destroyed, and when the company are called on to make good the loss, they, for the first time, investigate the title, and finding it defective, refuse to pay, because the policy is void. Although, in fact, at the time of the insurance, the insured had not a full title to the property, he may have believed that he had, and there might not have been, in the mind of any one, the slightest suspicion of any defect in the title. But subsequently, such defect may have been discovered by the decision of a law suit, in which some nice and difficult question was settled, contrary to the previous impression of the legal profession. The argument, *ab inconvenienti,* therefore, is not so decidedly in favor of the appellees, as to justify such a construction of the charter, as will give to the words of the first section any other meaning than "their genuine and natural signification and import." As the expression, "any kind of property," must include personal as well as real estate, we are of the opinion, that this company have the authority to insure, whatever interests are insurable, in ordinary fire insurance companies.

At different times doubts have existed in regard to what interests might be insured, but it is now well settled, that a party having a mortgage or other lien upon real property, may insure the property to secure his claim. 1 *Phill. on Ins.,* 107, 108, *(2nd Ed.) Hammond on Fire Insurance,* 21, 22. In the case already referred to, in 7 *B. Monroe,* 470, the insured having only a lien upon the property created by deed, his right to make the insurance was resisted, but not success-

fully.   The court held the interest to be insurable.   And in deciding this question they say, "the plaintiffs had a right to have the property included in their policy insured, for the purpose of guarding against the loss of their debt by the destruction of the property bound for its payment.   A debt is not itself a proper object of insurance, neither is the title to the estate, or any interest which an individual may have in it, but the property itself may be insured, as a means of securing the assured by the preservation of the property, from the loss of his interest, whatever that may be."   And this was a claim against a mutual insurance company.

Believing that at the time of the insurance, and also when the property was destroyed, the appellant had a lien, which was an insurable interest, we deem it unnecessary to notice the other grounds on which he claimed the policy to be valid.

There is no allegation of any fraud or misrepresentation on the part of the appellant, in relation to his title to the property, or that anything was said about it.   The record contains no evidence on that point.

Entertaining these views, we are brought to the conclusion, that the court below erred in granting the first prayer of the appellees.

The second prayer of the appellees, which was also granted by the court, is based upon the eighth of the terms and conditions for making insurances, annexed to, or rather appearing at the foot of the policy; which eighth condition is as follows: "In case of any material increase of risk to the property insured in this company, such increase of risk must be notified to the company, and written permission therefor be obtained from the secretary, for which such charge as may be proper must be paid."

As the words "*material increase of risk*" are used in this condition, it is unnecessary for us to say whether these conditions are to be considered as warranties, and requiring a strict compliance in every particular, or not as warranties, and therefore rendering a substantial compliance sufficient.   For here the condition itself expressly providing for a material increase of

risk, of course, it cannot include any increase which is not material.

The court instructed the jury, that the plaintiff could not recover, if they should find that the improvements or alterations, either in themselves or during their progress of completion, occasioned *any additional increase of risk.* They say *additional* when the condition is *material.* The difference between these two words is important in a case like this. An increase, however trifling, might be an additional increase, but every additional increase might not be a material increase, in a legal sense. The word used by the court was therefore calculated to mislead the jury. They might have thought the testimony sufficient to prove some additional risk, which, under the instruction, would justify a verdict for the defendants, when the same evidence would not have induced them to believe there was any *material increase of risk;* especially as there was testimony offered on the one side to establish the materiality, and on the other to disprove it.

An examination of a few cases will show how very important it is to ascertain, in suits upon policies of insurance, whether an increase of risk is material or not. And especially so, when repairs or improvements are the subjects of inquiry.

*Dobson vs. Sotheby and others, Moody and Malk. R.*, 90. And 1 *Phill. on Ins.*, 415, 416, is a leading case, and is frequently referred to, as such, in subsequent decisions. There the conditions endorsed on the policy, required the assured to give a description of the property to be insured, and provided that all insurances on property falsely described, "so that the same might be charged at a lower premium than would otherwise have been charged, should be void." The premises were described as "a barn, situated in an open field, timber built and tile," at the lowest premium charged on buildings where no fire was kept, and no hazardous goods deposited. A provision was endorsed, that "if buildings insured with the company should, at any time after such insurance, be made use of, to stow or warehouse any hazardous goods without leave from the company, the policy should be

void." For the purpose of tarring the building, a fire was made inside and a tar barrel brought in. By the neglect of a servant, in the absence of the assured, the tar boiled over and took fire, and the building was consumed. Lord Tenderden, C. J., held, that if the company designed to provide, not only against the keeping of fire on the premises, but that "none should ever be introduced upon them, they might have expressed themselves to that effect." And the provision or condition was construed, as prohibiting "only the habitual use of fire, or the ordinary deposit of hazardous goods, not their occasional introduction, as in this case, for a temporary purpose connected with the occupation of the premises." The judge also says: "The common repairs of a building necessarily require the introduction of fire upon the premises, and one of the great objects of insuring, is security against the negligence of servants and workmen."

In *Shaw vs. Robberds, et al.,* 6 *Adolphus and Ellis,* 75, and 1 *Nevile and Perry,* 275; also noticed in 1 *Phill. on Ins.,* 414, 415, the sixth condition of the policy provides: "If any alteration or addition be made in or to the buildings or covering of any premises insured, or in which any insured property is contained, or the risk of fire to which such building is exposed, be by any means increased, or if any furniture or goods be removed into other premises, such alteration, addition, increase of risk or removal must be immediately notified and allowed by endorsement on the policy, (the endorsement being duly made and signed by one of the society's secretaries or agents,) otherwise the insurance, as to such buildings or goods, will be void."

The insurance was on a granary, "with a kiln for drying corn attached." One of the conditions of the policy was, "that the trades carried on in the premises were accurately described, and if a kiln or any other process of fire-heat were used and not noticed in the policy, it was to be void." The property was destroyed by fire, in consequence of using the kiln three days in drying a cargo of bark, which had been sunk. The bark was to be dried gratis. It was found by

the jury that using the kiln for this purpose, was more hazardous than in drying corn. It was, nevertheless, held by Lord Denman, C. J., that the policy was not thereby made void. He considered the sixth condition as pointing "to an alteration of business, at something permanent and habitual," and that "this single act of kindness was no breach of the condition." *Dobson vs. Sotheby*, is referred to by the judge as having been decided upon the same principle, and as an authority in point. And afterwards he says: "No clause in this policy amounts to an express warranty that nothing but corn should ever be dried in the kiln."

The jury finding that the act complained of by the insurers, was more hazardous than the drying of corn, shows clearly an increase of risk, and yet it was not such an increase as was held to require the stipulated notice and endorsement, although the policy provided, that *if the risk should be increased by any means, notice should be given thereof, and allowed by* endorsement, or otherwise the insurance to be void.

In *Jennings vs. The Chenango County Mutual Ins. Co.*, 2 *Denio*, 75, by a condition annexed to and expressly made part of the policy, it is provided, that the policy shall be void, if after the insurance the risk shall be increased by any means whatever within the control of the insured, or if the buildings shall be occupied in any way, so as to render the risk more hazardous than when the insurance was effected. The property included in the policy was a mill. On page 83, it is decided, that a work bench and tools kept in the mill, for the purpose of repairing it, was no violation of the contract. And it is held to be the undoubted right of the insured, to place in the mill suitable materials and tools to make ordinary repairs of the building, without any danger of forfeiting his policy.

In *Grant vs. The Howard Ins. Co. of New York*, 5 *Hill*, at *page* 14, C. J. Nelson says: "To adjudge that the clause under consideration relates to the repairs of the building insured, would have the effect to cut off all right of making any repairs, however proper and necessary; a construction that

should not be admitted, except upon the most clear and ex-
plicit terms."

The case of *Jolly vs. The Baltimore Equitable Society, &c.,*
1 *H. & G.,* 295, fully sanctioned the right of the insured to
make a thorough repair of the premises.   And the judge dis-
carded the attempted distinction between the right to make
ordinary repairs, and such a thorough repair as would render
the house tenantable.   There it was held, that alterations
*materially* enhancing the risk, and not necessary to the en-
joyment of the premises insured, if they should occasion a
loss by fire, then the insurers would be released from liability
under the policy.   On page 306, the opinion of the learned
judge, in the case of *Stetson vs. The Massachusetts Fire Co.,*
4 *Mass. R.,* 330, is noticed with approbation, in which it is
said: "If every, the least, alteration or enlargement of a build-
ing insured against fire, is necessarily and of course material
to the risk, and whenever it is made by the act or consent of
the insured, is to vacate the policy, unless it should be re-
newed by the insurer; so close a restraint upon the party
would place contracts of this kind in a state of complete un-
certainty, and would render them so inconvenient as wholly
to prevent them."

See, also, **3** *Comstock's R.,* 122, *O'Neil vs. The Buffalo
Fire Ins. Co.*

The cases referred to are quite sufficient to show, we think,
that under the eighth condition of this policy, the plaintiff's
right of action could not be defeated, unless the improvements
or alterations relied upon in defence, created *a material in-
crease of risk,* and, therefore, that the court below should not
have granted the second prayer of the defendants.

Under the circumstances of this case, the expression *addi-
tional increase* is rather singular.   When an insurance is
effected, there is necessarily some risk supposed to exist.
Any act afterwards producing risk, is an increase of risk or
an additional risk, but to call this an additional increase
would be tautology.   If one act producing risk occurs, and
then another, the second might be called an additional in-

crease of risk, having reference to the first.   Here we under-
stand the prayer as referring to one set of improvements, all
of which, taken together, occasioned the injury complained
of.   Whether, however, the improvements or alterations made
an increase of risk, or an additional risk, or an additional in-
crease of risk, the right of the plaintiff to recover was not de-
feated, unless, according to the condition, such increase was
*material.*

The plaintiff asked for an instruction, which was properly
refused by the court.   The prayer assumed, that admitting
the improvements or alterations so affected the risk as to be
within the provisions of the eighth condition, still the plaintiff
was released from the obligation of giving notice and obtain-
ing permission, if the jury believed he had made reasonable
efforts to do so, and was prevented by the negligence or mis-
conduct of the defendants or their secretary.   In this he was
mistaken.   The present is not one of those instances, in which
an excuse for non-performance will avail in lieu of perform-
ance, or where a man will be excused for not doing a thing,
in consequence of the neglect or refusal of another party to
do something, which is required to be done on his part.   The
company were not bound to give permission whenever asked,
but had a discretion to do so or not.   To deny them such a
right, might subject them to very great hazard.   If an insur-
ance should be effected at the lowest premium, and afterwards
the insured wishes to make an improvement of a very hazard-
ous character, it cannot be the true spirit and meaning of this
condition, that if application is made for permission, the com-
pany have no discretion, but must consent.   Under the second
section of the act of 1844, ch. 229, and the sixth by-law, they
are authorised to cancel any policy, whenever they may deem
it necessary.   If then application for permission to make im-
provements, which would occasion very great hazard, should
be presented, the company would be very apt to prefer can-
celling the policy, rather than consent to the proposed altera-
tion.   It will avail nothing to say, this is putting an extreme
case; for after providing for "*any material increase of risk*,"

the condition makes no distinction between degrees of materiality, from the lowest to the highest grade. And it would be a difficult task, in a matter of this nature, to draw a line, dividing the class of improvements, *materially* increasing the hazard, for which the company would be compelled to give their consent, from those, in regard to which, they could exercise a discretion. Moreover, the party is to pay "such charge as may be proper," for permission to make the material increase of risk. The amount to be paid being uncertain, it could only be ascertained by agreement between the parties, necessarily implying a discretion on both sides. No one can doubt the right of the insured to abandon his contemplated improvements, rather than pay a sum for the privilege of making them, which he considered exorbitant, and if so, it would seem to be but equal justice, that the company should be allowed authority to decline consenting to have their risk greatly enhanced, when the party asking their consent has offered as compensation a sum far below what they consider a proper charge. It could not have been the design of this condition to take from the company all control of, and power to restrain, hazardous changes of insured property. And such would be the effect of denying them a discretion in the premises. Whilst a different construction would impose no serious hardship upon the insured. We see nothing in this record which prohibited him, without asking the consent of the appellees, from making whatever repairs were necessary or appropriate, for the purpose of rendering or keeping the mill useful and profitable, according to its design and character at the time it was insured. And if he desired to make alterations and improvements beyond this, so as materially to increase the risk, if from any cause he could not obtain the necessary permission, he had a right immediately to cancel the policy and effect an insurance elsewhere. In doing this he would have no difficulty, unless indeed the proposed improvements should be such as no company would be willing to insure, and if so, he could not complain of a disappointment in his application under his original contract. The

third section of the charter gives him the authority to have his policy cancelled whenever he may think proper.

The condition requiring permission, and the appellees having the right to give or to refuse it, if the appellant proceeded without it, he did so at his own peril, provided the alterations or improvements made by him are such as the condition prohibits, unless consented to by the appellees. In consequence of the discretion in the company, the excuse for not having obtained permission, which is relied upon in the prayer, will not avail. Under such circumstances, no court or jury would have authority to assume, that if the first secretary mentioned in the testimony had been a very attentive and faithful officer, regularly to be found in a convenient and suitable office, kept for the transaction of company business; and that the last secretary was well instructed in all the duties required of him, and attentive and prompt to perform them, that the company, or either secretary, would have given the permission desired by the appellant. From the testimony offered, and on which the prayer is predicated, it is manifest that the prayer denies any discretion on the part of the defendants, and assumes that the plaintiff had a right to demand the permission, and that the failure to obtain it resulted alone from the difficulty of being able to find the first secretary, and the want of proper official information on the part of the last. Believing the company had a discretion, we concur with the court in their opinion on this prayer.

*Judgment reversed and procedendo awarded.*